```
                 UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF NEW YORK
                                       :
JENNIFER ARMSTRONG,                    :
     Plaintiff,                        :
                                       :
                                       :
     v.                                :    No. 1:03-cv-597
                                       :
JOHN E. POTTER, POSTMASTER             :
GENERAL, UNITED STATES POSTAL          :
SERVICE,                               :
     Defendant.                        :
                                       :
```

### OPINION AND ORDER

Plaintiff Jennifer Armstrong has brought this suit against her former employer, the United States Postal Service ("USPS"), claiming disability discrimination in violation of § 504 of the Rehabilitation Act of 1973 and racial discrimination in violation of Title VII of the Civil Rights Act of 1964. A bench trial was held on April 1 and 2, 2008. The resolution of Armstrong's claims turns largely on the weight and credibility accorded to the parties' respective witnesses. Based on the testimony and evidence presented at trial and the Court's observation of the witnesses and assessment of their credibility, the Court makes the following pertinent findings of fact and conclusions of law.

### I. FACTUAL FINDINGS

Jennifer Armstrong is a fifty-one year old woman. Born in Trinidad and Tobago, she has lived in the United States since 1981 and been a citizen of the United States since 1989. After

graduating from secretarial school in 1982, she worked for various New York state agencies for approximately thirteen years. In 1994, the USPS hired Armstrong to work part-time as a data conversion operator.  In 1995, Armstrong began working full-time as a data conversion operator.  Her job duties primarily consisted of typing in addresses that the computer could not read.

On December 24, 1996, Armstrong first saw Dr. Richard Alfred for pain in her right wrist.[1]  Dr. Alfred instructed Armstrong to stay out of work for a brief period in January 1997.  He diagnosed her with carpal tunnel syndrome on March 20, 1997.  Dr. Alfred provided the USPS with medical documentation modifying Armstrong's work hours, and then, on April 3, 1997, temporarily restricted her from work altogether while she underwent treatment and physical therapy.  Armstrong was referred to Dr. David Quinn, a hand specialist and associate of Dr. Alfred, in May 1997.  On May 29, 1997, Dr. Quinn provided documentation that Armstrong was

---

[1] In accordance with the Court's instructions at the close of trial, to which both parties agreed, Armstrong has submitted a number of documents from Dr. Alfred's file, all of which were sent to the USPS Injury Compensation office or to the Office of Workers Compensation Programs  or both.  The Court hereby admits these documents into evidence as Plaintiff's Exhibit 13.  It is unclear whether the USPS's earlier objections to admission are preserved in light of counsel's failure to respond to Armstrong's letter motion dated June 23, 2008.  Regardless, the Court finds that the file has been adequately winnowed to include only admissible and relevant documents; therefore, the objections raised by the USPS to the admission of Dr. Alfred's entire patient file in its post-trial memorandum no longer apply.

temporarily totally disabled, copies of which were also forwarded to the Office of Workers Compensation Programs ("OWCP"). Over the next six months, both Dr. Alfred and Dr. Quinn corresponded regularly with OWCP, confirming her continued status and providing detailed medical information, including a work capacities assessment report dated June 26, 1997. As of September 16, 1997, Dr. Quinn concluded that Armstrong had a moderate partial permanent disability. Dr. Quinn corresponded directly with the Injury Compensation office of the USPS in March 1998 confirming Armstrong's disability and advising that she could not return to the data conversion position. The USPS requested an independent medical examination which was conducted by Dr. Shashi Patel on March 26, 1998. Dr. Patel confirmed the diagnosis of carpal tunnel syndrome which he opined may "last for several months or years," and concurred in Dr. Quinn's assessment of Armstrong's work capacity.

Connie Hall, a USPS employee in Injury Compensation, began attempting to secure Armstrong a more suitable position in May 1998. The USPS offered Armstrong a "rehabilitation job" as a custodian in July 1998. Armstrong consulted with Dr. Quinn about the position and the modified duties. Armstrong was eager to return to work and despite reservations regarding her ability to perform certain specified duties accepted the position on September 2, 1998. The custodial position required Armstrong to

3

perform a number of tasks, including scrubbing, wiping and sweeping, that caused her wrist pain.  In addition, the position involved frequent pushing and pulling of large, heavy bins and lifting of trash bags that weighed over twenty pounds.  On or about September 22, 1998, while working in this position, Armstrong aggravated her lower back.[2]  Armstrong saw Dr. Alfred who diagnosed a lumbosacral strain, prescribed medication and advised Armstrong to remain out of work.  Dr. Alfred provided her with a note for the USPS and also forwarded copies of his report to OWCP.  On September 29, 1998, Dr. Alfred advised the USPS that due to Armstrong's wrist and back injuries, she was not capable of returning to the custodial position.  He recommended that she be reassigned to a "more sedentary position."  On October 14, 1998, Carol Murphy of Injury Compensation notified Dr. Alfred that the USPS had a position for Armstrong that "would only require [her] to answer telephones, photocopy, and when requested access forms from a file cabinet and hand them to the requesting individual."  Dr. Alfred responded within a week approving this position. He again sent copies of all of this correspondence to OWCP.  Another independent medical evaluation was completed by Dr. William Rogers, an occupational medical specialist, who wrote to Connie Hall on October 27, 1998, concurring that Armstrong was

---

[2] Armstrong had sustained injuries to her lower back in an automobile accident some years earlier, but these injuries appeared to have resolved prior to September 1998.

capable of performing the proposed position (answering telephones and performing some clerical duties).[3]

On October 28, 1998, Armstrong returned a signed acceptance letter to the USPS agreeing to take the proposed position. However, she was subsequently notified that the position had "disappeared." Armstrong remained eager to return to work and contacted the office of Congressman Michael McNulty who filed an inquiry with the USPS. Anderson Hodges, the USPS Chief Executive Officer for the Albany District, replied that the USPS was attempting to find a position for Armstrong in December 1998. As of March 1999, the USPS had not communicated any other position to Armstrong. On or about March 10, 1999, Armstrong advised the USPS that she had applied for disability retirement. Hall was eager to prevent Armstrong from receiving compensation; she wrote to another co-worker one week later, "[It is imperative that we offer [Armstrong] a new rehab assignment before her disability retirement is approved."[4]

On May 13, 1999, the USPS offered and Armstrong accepted a new limited duty position in the Rensselaer Post Office ("RPO") which Hall believed accounted for all of Armstrong's physical

---

[3] Dr. Rogers also opined that Armstrong might be able to return to a modified custodial position if she were to complete a functional capacity and work hardening program.

[4] There was evidence entered showing that Hall and Armstrong had a history of somewhat contentious and heated interactions.

5

limitations.  In actuality, however, the new position required Armstrong to regularly lift large tubs of "hold mail" weighing thirty to forty pounds.  Armstrong contacted Jerry Weaver, her union representative and president of the local chapter at the time.  Weaver did not believe that Armstrong's position was light-duty and he spoke with the local Postmaster James Foley.  Foley indicated that he did not know about Armstrong's restrictions.  He advised that there was not any other work at the RPO but that Armstrong could ask for help.  Due to the small size of the RPO, however, there were generally no other employees available to assist Armstrong with the lifting.

Again suffering serious lower back pain, Armstrong was treated by Dr. Alfred on June 29, 1999, who again initiated physical therapy and subsequently removed her from work on July 29, 1999.  From the original aggravation of Armstrong's back injury in the fall of 1998 through the end of 1999, Dr. Alfred provided ongoing treatment, seeing Armstrong at approximately two to six week intervals.  Throughout this period, Dr. Alfred and his office corresponded repeatedly with the USPS employees at the Injury Compensation office (including Connie Hall) and with OWCP, providing updated reports and information.[5]  During this time, OWCP sought another independent medical examination, this time by

---

[5] During this time, Armstrong also underwent a nerve conduction study, conducted by Dr. Frederick Schoen, which confirmed that she had bilateral carpal tunnel syndrome.

Dr. Edwin Mohler.  Dr. Mohler submitted a report to OWCP on September 8, 1999, based solely on a single physical examination, in which he opined that Armstrong's condition had resolved.  Dr. Alfred sent OWCP letters strongly disagreeing with and refuting Dr. Mohler's conclusions in September and November of 1999.

In December 1999 and January 2000, the USPS issued Armstrong two notices advising her to provide medical documentation regarding her absence from work.  During this same period Dr. Alfred continued to correspond with OWCP regarding Armstrong's continued prognosis and physical restrictions.  In both his earlier correspondence with Injury Compensation and his ongoing correspondence with OWCP, Dr. Alfred repeatedly made clear that Armstrong was not capable of returning to either the data conversion or custodial positions and that he did not believe her prognosis would change.  In addition, it was both the stated policy and practice of the USPS that information generally and medical documentation in particular be communicated from OWCP to Injury Compensation and vice versa.  Nonetheless, between April 25, 2000, and September 1, 2000, the USPS notified Armstrong of a number of suspensions for having been absent from work without leave.  During this time, Armstrong contacted Weaver who testified that at least one of the suspensions was either removed or reduced.  In addition, Weaver contacted Hall and Anna Schubert, a USPS employee and labor relations specialist, to

arrange a meeting.

In October 2000, Armstrong, Weaver, Schubert and Hall met at the Albany general mail facility to discuss potential positions that would conform with Armstrong's physical restrictions.  The meeting lasted between thirty and forty-five minutes.  Weaver testified that Hall mentioned that there might be a position available for Armstrong in the reception booth at the Albany facility (these positions were generally staffed by employees who had physical restrictions).[6]  Hall and Schubert advised Armstrong that she needed to submit a request for a light-duty assignment in writing.  On or about October 26, 2000, Armstrong submitted a written request along with a note.  Weaver testified that neither Hall nor Schubert requested that Armstrong submit additional medical documentation at the meeting.  There is no evidence that the USPS made any request for additional medical documentation after Armstrong submitted her written request.  Nonetheless, the USPS has subsequently argued that it was not able to act on Armstrong's request because it lacked such documentation.  In January 2001 the USPS notified Armstrong that she was being separated the service.

---

[6] The four witnesses provided somewhat discrepant testimony about certain details of the meeting.  The Court has principally accepted the account of Weaver as most credible.

**II. LEGAL CONCLUSIONS**

A. *Disability Claim*

Armstrong has brought a claim alleging disability discrimination in violation of her rights under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  The Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted . . . by the United States Postal Service."  29 U.S.C. § 794(a).

To sustain a claim of employment discrimination against the USPS, a plaintiff must show that she is an individual with a disability under the Act, that she is otherwise qualified to perform her job, and that she was discharged because of her disability.  *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994).  An individual with a disability is defined as any person who "has a physical or mental impairment which substantially limits one or more of [her] major life activities; has a record of such an impairment; or, is regarded as having such an impairment."  29 U.S.C. § 705(20)(B).  "Physical or mental impairments" include physiological conditions affecting the musculoskeletal system; "major life activities" include such tasks as working and performing of manual tasks.  45 C.F.R.

9

84.3(j)(2)(I), (ii).

As detailed above, Armstrong introduced substantial evidence establishing that she qualifies as an individual with a disability under the Act.[7] In 1996 and 1998 respectively she developed two medical conditions, carpal tunnel syndrome and lumbosacral strain, both of which were triggered by her employment duties. These conditions affected major life activities, in particular work and the performance of manual tasks. The evidence also shows that Armstrong would have been capable of continuing to work at the USPS had reasonable accommodations been offered. On numerous occasions, the USPS proposed and offered positions for which Armstrong was qualified; however, in each case the USPS failed to follow through and to make reasonable accommodations where necessary. Notably, Armstrong was offered and accepted a rehab position in October 1998 for which she was clearly qualified, but the USPS withdrew this position without explanation.

In response to Armstrong's claim, the USPS has advanced three arguments. First, it has challenged the existence of a disability. Yet with the exception of Dr. Mohler's report, the USPS has offered no other basis for its challenge. As noted above, Dr. Mohler's report was based solely on a single physical

---

[7] In addition to the overwhelming medical documentation, the evidence suggests that various USPS employees recognized and were aware of Armstrong's disabilities.

10

examination and is contradicted by the weight of medical evidence submitted.  The largely unanimous findings of the various physicians and medical specialists who examined, tested, diagnosed and treated, including Dr. Alfred and Dr. Quinn who met with Armstrong repeatedly, support a finding of disability.

Second, the USPS has argued that it was not sufficiently on notice of Armstrong's medical restrictions.  The USPS acknowledges that Dr. Alfred communicated extensively with the OWCP.  Nonetheless, it argues that Armstrong was also required to provide identical information to Injury Compensation and her USPS supervisors directly.  This argument fails in the first instance because the record establishes that Dr. Alfred did communicate Armstrong's prognosis and medical restrictions to Injury Compensation on numerous occasions.  Furthermore, the USPS's argument is undercut by its stated policy guidelines directing OWCP and Injury Compensation to share all medical records; the Department of Labor Employing Agency Personnel Handbook  and the Department of Injury Compensation Handbook provide for communication of precisely such records between OWCP and Injury Compensation.  *See Francis v. Runyon*, 928 F. Supp. 195 (E.D.N.Y. 1996) (finding that Injury Compensation "acts as an agent for OWCP" in such cases).  Indeed, the testimony of Hall, a USPS injury compensation specialist, confirmed that such documents were routinely transferred back and forth between the offices.

On a related note, the USPS has also argued that it duly attempted to make reasonable accommodations but that it was frustrated in its attempts by Armstrong's failure to communicate her medical restrictions.  Yet, by 1999, Dr. Alfred had made clear that Armstrong's prognosis was stable and that her physical restrictions would not change, providing detailed information to Injury Compensation about her specific limitations on lifting, pushing/pulling, bending, and keying.  Despite having this information, Injury Compensation largely failed to attempt to accommodate Armstrong; then, based on its own delay, the USPS claimed that Armstrong had been remiss in updating her medical information.  In fact, the evidence showed only one occasion on which Injury Compensation acted relatively quickly to accommodate Armstrong—the offer of the limited duty position at the RPO in the spring of 1999.  Yet Hall testified that she made this offer with the express goal of preventing Armstrong from receiving disability compensation.  Moreover, the record suggests that the position did not actually address a number of Armstrong's restrictions and that these restrictions may not even have been communicated to the local postmaster.

Along these same lines, the USPS has argued that it specifically instructed that Armstrong provide additional medical documentation in conjunction with her October 2000 request for light duty work.  The USPS has failed to provide any evidence of

12

specific written communication from the USPS seeking medical documentation. Moreover, as noted above, the Court has found no evidence that such medical documentation was orally requested at the time of the October 2000 meeting. The Court rejects the USPS's argument that Armstrong was terminated for legitimate and nondiscriminatory reasons. The Court concludes that Armstrong was discriminated against because of her disability and that the USPS failed to offer reasonable accommodations in violation of her rights under the Rehabilitation Act.

*B. Racial Discrimination*

Armstrong has also brought a claim alleging racial discrimination in violation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). To establish a claim of disparate treatment under Title VII, Armstrong must show that she has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin. *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004). Armstrong must first make a prima facie showing that she belonged to a protected class; that she was qualified for the position she held; that she suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Id*. at 152.

Under the Title VII burden-shifting analysis, if Armstrong

makes such a showing the burden shifts to the USPS to proffer a legitimate, non-discriminatory reason for her dismissal. *McDonnell Douglas Corp. v. Green*, 411 U.S. 782 (1973). Upon such a proffer, the presumption evaporates and the burden returns to Armstrong to establish both that the proffered reason is false and that the USPS acted on the basis of racial discrimination. *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993)).

Even assuming, based on the factual findings detailed above, that Armstrong has met her initial burden, her racial discrimination claim must fail. The USPS has asserted that her removal was necessitated by her failure to provide adequate medical documentation. The Court has already considered this proffered rationale above and has rejected its factual basis with regard to Armstrong's disability claim. Nonetheless, in order to succeed on her Title VII claim, Armstrong would also need to prove that the USPS's actions were the result of intentional racial discrimination. *James*, 233 F.3d at 154. In this case, Armstrong has not offered any significant evidence to support such a finding, only speculation and conjecture.

To the extent that Armstrong has moved to reopen the evidence in order to elicit testimony from Joseph Harden regarding the staffing of the reception booth at the Albany

facility, the Court hereby denies the motion. First, the Court reiterates that there significant questions about the foundation for Harden's testimony, as discussed in detail at trial. Moreover, based on Harden's affidavit and the proffer made by counsel, it appears clear that his testimony would necessarily fall short of the evidentiary burden required by law because there is no evidence on the record that the employees working in the reception booth were similarly situated to Armstrong. *See Alfano v. Costello*, 294 F.3d 365, 375 (2d Cir. 2002) ("[W]here discriminatory motive is to be proved by evidence of disparate treatment, the plaintiff must demonstrate that employees who are similarly situated in all material respects received more favorable treatment.").

*C. Damages*

At the conclusion of the trial, the Court instructed the parties that they would be permitted to stipulate to damages in the event that either of Armstrong's claims was found to be meritorious; in the absence of any stipulation, the Court instructed the parties that a hearing on damages would be scheduled. The parties have not stipulated to damages and the Court will therefore schedule a hearing to resolve this issue.

### III. CONCLUSION

For the foregoing reasons, the Court ORDERS judgment in favor of the Plaintiff on the claim of disability discrimination

in violation of § 504 of the Rehabilitation Act of 1973 and ORDERS judgment in favor of the Defendant on the claim of racial discrimination in violation of Title VII of the Civil Rights Act of 1964.

    Dated at Burlington, Vermont this 4th day of September, 2008.

                                           /s/ William K. Sessions III[8]
                                           William K. Sessions III
                                           United States District Court

---

[8] Sitting by designation in the Northern District of New York.